IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CRAIG L. HINTON,

    Petitioner,                      No. CIV S-01-1174 MCE JFM P

    vs.

CHERYL PLILER, Warden, et al.,

    Respondents.                 FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his July 14, 1998, convictions for murder in the second degree, CAL. PENAL CODE § 187(a), and using a firearm during the commission of an offense, CAL. PENAL CODE §12022.5(a), and the sentence of 34 years to life in prison imposed thereon on July 14, 1998. Petitioner raises three claims in his third amended petition, filed June 22, 2005. Petitioner alleges that the application of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) cannot be constitutionally applied because it violates the principle of separation of powers. Assuming AEDPA applies, Petitioner raises two challenges in the alternative. First, Petitioner argues that federal habeas relief is warranted as a result of the Government's intentional suppression of exculpatory evidence. Second, Petitioner states that his constitutional rights were violated when the trial court directed further deliberations after jurors had declared themselves to be deadlocked.

FACTS[1]

Richard Jones drove defendant and Ravinesh Singh to West Sacramento in the late evening of August 15 or early morning of August 16, 1997. The three got out of the car near Maple Street. Defendant went ahead of the other two to meet with a man he claimed owed him money. Jones and Singh heard defendant arguing with a man later identified as the victim and heard defendant tell the victim to "pay up." The victim started walking away from defendant, and defendant shot him several times. Police found the body of the victim, Maurice Drye, in a parking lot on Maple Street. He had been shot six times. The murder weapon belonged to defendant. Defendant's fingerprint was on the magazine inside the weapon. There were no other identifiable prints on the gun or magazine.

Defendant was charged with the first degree murder of Drye. He was also alleged to have personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a)[], and to have previously suffered a conviction for a serious felony (robbery) within the meaning of [Penal Code] section 667, subdivisions (c) and (e)(1). The jury convicted defendant of second-degree murder and found he personally used a firearm during the commission of the crime. The court found true the prior conviction allegation and sentenced defendant to an indeterminate term of 30 years to life, plus an additional four years on the firearm enhancement.

(People v. Hinton, slip op. at 2-3).

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Hinton, No.# C030069 (March 31, 1999) (hereinafter Opinion), a copy of which was lodged with the clerk of the court on March 20, 2002.

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

II. Petitioner's Claims

   A. The Constitutionality of AEDPA

Petitioner's first claim is that the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) is unconstitutional as it impermissibly violates the separation of powers doctrine. (Pet.'s Third Amended Br. 3-7.) This argument is without merit. The legislative preclusion found in AEDPA regarding the sources of judicial review do not violate the doctrine of separation of powers.

/////

Article III of the Constitution directs that the judicial power shall lie within the Supreme Court and other federal courts that Congress may designate. As such, the Constitution vests within the "judicial department" the exclusive power "to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Congress' direction that the source of clearly established law in AEDPA shall be that "determined by the Supreme Court of the United States" does not impinge upon this constitutionally directed separation of powers. 28 U.S.C. § 2254(d)(1).

The Supreme Court has consistently refused to disturb lower court rulings affirming the constitutionality of AEDPA. See Green v. French, 143 F.3d 865, 874-75 (4th Cir. 1998), cert. denied, 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999); Lindh v. Murphy, 96 F.3d 856, 867-70 (7th Cir. 1996)(en banc), rev'd on other grounds, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). While Plaintiff correctly notes that oral argument has been requested by the Ninth Circuit as to the constitutionality of AEDPA, see Irons v. Carey, 408 F.3d 1165 (9th Cir. 2005), no decision has issued in that case. As a result, the court finds that the circuit's previous rejections of claims that AEDPA violates Article III of the Constitution remain binding. See Allen v. Ornoski, 435 F.3d 946 (9th Cir. 2006).

B. Timeliness of Habeas Petition

The Respondent claims that Petitioner's petition must be dismissed as untimely. (Resp't Answer Third Am. Pet. 31-33.) According to Respondent, Petitioner's delay of 551 days between the denial of his petition for review by the California Supreme Court and the filing of his habeas petition violates the one year statute of limitations under AEDPA. (Id. at 33.) As the period of delay between Petitioner's state filings was not unreasonable, the court recommends that Respondent's request for dismissal be denied.

California's collateral review system differs from other states in that it evaluates timeliness on a reasonable standard as opposed to an absolute standard. Carey v. Saffold, 536 U.S. 214, 221, 122 S.Ct. 2134, 2139, 153 L.Ed.2d 260 (2002); compare Ala. Rule App. Proc. 4

1  (2001)(declaring a 42 day window within which to appeal). In order to promote "comity,
2  finality, and federalism," <u>Williams v. Taylor</u>, 529 U.S. 420, 436, 120 S.Ct. 1479, 146 L.Ed.2d
3  435 (2000), a petitioner must first exhaust his state remedies prior to filing in federal court,
4  <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). During those
5  periods in which state remedy is pending, AEDPA is tolled. <u>Carey</u>, 536 U.S. at 220; 28 U.S.C. §
6  2254(d)(2). Upon completion of state review, AEDPA grants petitioners one year to file their
7  claims. 28 U.S.C. § 2254(d)(1).
8        Petitioner waited approximately six and a half months between the denial of his
9  direct appeal by the Superior Court and filing in the Court of Appeals and three months between
10 his denial by the Court of Appeal and filing in the Supreme Court. This 10 month period of time
11 was not unreasonable and must be excluded from the AEDPA statute of limitations calculation.
12 The Court of Appeal did not find the six and one half month delay to be unreasonable.
13 Furthermore, while Plaintiff filed essentially identical applications in the Superior Court and
14 Court of Appeal, given the realities of the prison system, a cumulative 10 month delay is not
15 unreasonable. See <u>Nino v. Galaza</u>, 183 F.3d 1003, 1005 (9th Cir. 1999)(quoting <u>Barnett v.</u>
16 <u>Lemaster</u>, 167 F.3d 1321, 1323 (10th Cir. 1999), which tolled "all of the time during which a
17 state prisoner is attempting, through proper use of state court procedures, to exhaust state court
18 remedies with regard to a particular post-conviction application"). Excluding this period of
19 reasonable delay, Petitioner's filing, made 245 days after the denial of the last of his state claims
20 was timely under AEDPA.
21     C. <u>Suppression of Evidence</u>
22       Petitioner's second claim is that the prosecution intentionally suppressed
23 exculpatory evidence that a key prosecution witness was mentioned in connection with a murder
24 investigation. During pre-trial proceedings in this case, the prosecutor learned that a witness was
25 connected with an ongoing investigation. (Doc. 6, lodged on August 23, 2005.) Over a year
26 later, the prosecutor notified Petitioner of this fact. <u>Id.</u> According to Petitioner, this failure of the

prosecutor to notify the defense of potential exculpatory evidence violated due process under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court finds no support for this alleged violation and recommends denial of Petitioner's claim.

There was no reasoned rejection of this Brady claim by the state courts. Rather, upon presentment of this particular claim by Petitioner, both the Court of Appeal for the State of California, Third Appellate District and the California Supreme Court issued "post-card" denials, stating simply that the "petition for writ of habeas corpus is denied." (Docs. 3, 5, lodged on August 23, 2005.) Petitioner contends that the failure by the state courts to specifically review and discuss this claim requires application of the pre-AEDPA standards of review. (Pet.'s Third Amended Br. 7-10.) Such a claim is without merit.

A terse "post-card" denial is an adjudication on the merits. Gaston v. Palmer, 417 F.3d 1030, 1038 (9th Cir. 2005); Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002), mandate recalled and reissued as amended by 311 F.3d 928 (9th Cir. 2002); Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992), cert. denied, 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). There is nothing in the record that indicates that either denial was procedural or not on the merits of Petitioner's claim. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This court is obligated to apply AEDPA standards as a result of the fact that there has been an adjudication on the merits, 28 U.S.C. § 2254(d), however, given the lack of reasoning provided in the previous denials, it must conduct an "independent review of the record...to determine whether the state court clearly erred in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). Upon review of the record, it is clear that the state court decision was objectively reasonable. See Williams, 529 U.S. 409.

In Brady v. Maryland, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; see also Bailey v. Rae, 339 F.3d 1107, 1113 (9th Cir. 2003).

1  The duty to disclose such evidence is applicable even though there has been no request by the
2  accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment
3  evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985).
4  There are three components of a Brady violation:  "[t]he evidence at issue must be favorable to
5  the accused, either because it is exculpatory, or because it is impeaching; the evidence must have
6  been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."
7  Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Banks v. Dretke, 540 U.S. 668, 691
8  (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).  In order to establish prejudice,
9  Petitioner must demonstrate that "'there is a reasonable probability' that the result of the trial
10 would have been different if the suppressed documents had been disclosed to the defense."
11 Strickler, 527 U.S. at 289.  "The question is not whether petitioner would more likely than not
12 have received a different verdict with the evidence, but whether "in its absence he received a fair
13 trial, understood as a trial resulting in a verdict worthy of confidence." Id.(quoting Kyles v.
14 Whitley, 514 U.S. 419, 434  (1995)); see also Silva, 416 F.3d at 986 ("a Brady violation is
15 established where 'the favorable evidence could reasonably be taken to put the whole case in
16 such a different light as to undermine confidence in the verdict.'")  Once the materiality of the
17 suppressed evidence is established, no further harmless error analysis is required.  Kyles, 514
18 U.S. at 435-36; Silva, 416 F.3d at 986.  "When the government has suppressed material evidence
19 favorable to the defendant, the conviction must be set aside."  Silva, 416 F.3d at 986.
20         It is clear that the withheld evidence did not result in prejudice to Petitioner.
21 Petitioner cannot show that there was a "reasonable probability" that the verdict in this trial
22 would have been different had the prosecutor disclosed the fact that Mr. Jones was named in
23 connection with a different murder under investigation.  Strickler, 527 U.S. at 289 (quoting Kyles
24 v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).  Indeed, given the
25 nature of the withheld evidence, and the other facts surrounding this case, there is nothing to
26 "'undermine [the court's] confidence in the outcome." Id. at 298 (Souter, J., concurring in part

and dissenting in part)(quoting Kyles, 514 U.S. at 435); see also Hovey v. Ayers, 458 F.3d 892 (9th Cir. 2006)("In determining materiality under Brady, we focus our inquiry on our confidence in the verdict.")

Nothing in the record demonstrates that Mr. Jones was ever charged, convicted, or called in for questioning or to testify in the other investigation. Petitioner argues that information about Mr. Jones' potential involvement in a different murder investigation would have permitted greater investigation of the case by defense counsel and impeachment during cross-examination. However, in speculating as to what might have occurred, Petitioner ignores the significant impeachment of Mr. Jones' testimony that was in fact elicited by defense counsel during trial. See Morris v. Ylst, 447 F.3d 735, 741 (9th Cir. 2006)(finding other significant impeachment evidence to be one factor in determining materiality).

Petitioner argued that Mr. Jones appeared to receive favorable treatment from the State as a result of his cooperation during Petitioner's murder trial. This treatment included a lowering of Mr. Jones' bail following his testimony at the preliminary hearing and a grant of use immunity for his testimony. (RT 433). However, the record fails to demonstrate any connection between the benefits conferred upon Mr. Jones and any activity in the other case in which Mr. Jones was involved.

Mr. Jones' grant of immunity became a rich source of material for cross-examination, as Petitioner elicited testimony from Mr. Jones that he had lied or omitted facts in previously immune sworn statements and testimony, casting doubt upon the veracity of his immune trial testimony. (RT 433-38.) Notable inconsistencies highlighted by Petitioner included Mr. Jones' recollection of when he first encountered Petitioner on the evening prior to the murder, (RT 463-64), and his remembrance about seeing the murder weapon returned to Petitioner, (RT 479). Any additional evidence regarding Jones' credibility was likely to be cumulative. See Williams v. Woodford, 384 F.3d 567, 599 (9th Cir. 2004)(holding no Brady violation when State failed to turn over tape recording in which one person claims witness

1  committed perjury in another, unrelated criminal case); United States v. Marashi, 913 F.2d 724,
2  732 (9th Cir. 1990). The jury was clearly well-informed of the problems with Mr. Jones'
3  testimony and the withheld evidence would have done little to "cast [Mr. Jones] in a significantly
4  worse light." Williams, 384 F.3d at 599 (quoting Williams v. Calderon, 48 F.Supp.2d 979, 1013
5  (C.D.Cal.1998)). Their lack of knowledge about any suspected involvement Mr. Jones had in an
6  unrelated crime does nothing to undermine confidence in the jury's verdict.

7  Furthermore, there existed substantial corroboration for many of the key elements
8  of Mr. Jones' testimony. Hovey, 458 F.3d at 920 (noting that corroborating testimony rendered
9  the withheld impeachment evidence immaterial); but see Silva, 416 F.3d at 980 (holding
10 withheld impeachment evidence material where, among other factors, witness was the only
11 witness who provided information about how murder took place and identified petitioner as the
12 killer). Arlene Hobbs, Mr. Jones' mother, confirmed that Petitioner knocked on her door and
13 that Petitioner asked her son if he would drive Petitioner to West Sacramento. (RT 539-40.)
14 Several witnesses confirmed Mr. Jones' statements about Petitioner's emotional state upon his
15 release from Sacramento County jail on August 15, 1997. (Testimony of Aaron Johnson at RT
16 242; testimony of Ms. Hobbs at RT 541, 562; testimony of Ravinesh Singh at RT 595; testimony
17 of Audrey Celest Taylor at 1323, 1324.) As it concerned the return of Petitioner's gun, multiple
18 witnesses confirmed the key details in Mr. Jones' statement about the exchange between Mr.
19 Johnson and Petitioner. (Testimony of Mr. Johnson at RT 239; testimony of Ms. Hobbs at RT
20 555; testimony of Mr. Singh at RT 597.) In addition, Mr. Johnson and Mr. Singh testified about
21 Petitioner getting into Mr. Jones' car with Mr. Singh immediately after receiving his gun. (RT
22 240, 599). Officer Bruce Wanner described seeing Petitioner leaving the scene of the murder
23 with two others behind him, both of whom fit the description of Petitioner. (RT 766-67.)

24 Mr. Singh provides the greatest corroboration for Mr. Jones' testimony. While
25 Petitioner elicited significant impeachment evidence about Mr. Singh, it is undeniable that Mr.
26 Singh's testimony confirmed many of the details described by Mr. Jones. Both witnesses

testified consistently about their drive to West Sacramento and Petitioner's motivation for making the trip, (RT 599-602, 604, 639, 665); about Petitioner's leadership of the trip to West Sacramento, directing where to park and stating that he wanted both Mr. Jones and Mr. Singh to accompany him while he confronted the deceased, (RT 602, 604-05, 639, 665-66); about their encounter with the victim immediately prior to the shooting, (RT 612-15); about the confrontation between Petitioner and the victim, consistently describing it as lasting no longer than 30 seconds, (RT 616-17, 623); and about the flight from the murder scene following the shooting, (RT 626-30). Most importantly, both Mr. Singh and Mr. Jones stated without equivocation that they saw Petitioner shoot the victim. (RT 617, 623.)

There was also physical evidence linking Petitioner to the crime. See Strickler, 527 U.S. at 293 (finding the "considerable forensic and other physical evidence linking petitioner to the crime" as one reason to deny habeas petition based upon Brady claim). The murder weapon was identified as Petitioner's. (RT 239, 1459.) Petitioner's fingerprint was found on the magazine inside the murder weapon. (RT 1089-90.) A substance consistent with gunshot residue was recovered from Petitioner's hand. (RT 1138-40.) Each of these objective factors supports Mr. Jones' recollection of events and argues against the materiality of the withheld evidence.

There is compelling evidence of Petitioner's guilt. See Morris, 447 F.3d at 741 (holding that evidence of guilt influenced the materiality of withheld evidence). The statements of Mr. Jones, corroborated by additional testimony from other witnesses, as well as physical evidence recovered from the murder scene, demonstrates that the withheld evidence was not material. Given the evidence at trial, as well as the preliminary nature of the withheld investigation, the absence of any connection between the withheld evidence and the crime at issue in this case, and the fact that at the time of the trial, no indictment was pending, nor has any indictment issued, it is difficult to see how the withheld information about Mr. Jones can be considered material. See United States v. Steinberg, 99 F.3d 1486 (9th Cir. 1996), disapproved

on other grounds, (finding habeas violation when government withheld information about criminal activity by witness that occurred at the time he witnessed the events to which he testified). The state's failure to reveal their investigative suspicions about Mr. Jones' involvement in an unrelated crime does not implicate this verdict. The court finds that denial of Petitioner's claim by the state court is neither contrary to nor an unreasonable application of federal law.

### D.  Direction by Court to Continue Deliberations Following Declaration that Jury Was Deadlocked

Petitioner's third claim is that the trial judge improperly directed jurors to continue deliberations after eight of nine polled jurors indicated that further deliberations would be fruitless.

The last reasoned rejection of this claim is the decision on Petitioner's direct appeal by the Court of Appeal for the State of California, Third Appellate District. The state appellate court rejected this claim on the ground that:

> A jury cannot be discharged unless "it satisfactorily appears that there is no reasonable probability that the jury can agree." ([Penal Code] § 1140.) The determination whether there is a reasonable probability of agreement rests with the sound discretion of the trial court. (*People v. Neufer* (1994) 30 Cal.App.4th 244, 254.) In the present case, the court was well within its considerable discretion in determining that after only three days of deliberation, part of which was spent rehearing testimony, and with one juror stating that further deliberations might be helpful, a reasonable possibility of agreement still existed.
>
> The court must, however, exercise its power without coercing the jury. (*People v. Proctor* (1992) 4 Cal.4th 499, 539.) In the present case the court did not know what part of the split vote favored guilt, and the court did not put any pressure on the minority to change its vote. The court did not tell the jury that it could not come back without a verdict. (See *People v. Pride* (1992) 3 Cal.4th 195, 265.) Rather, it instructed the jurors to come back with a verdict or a note that a verdict could not be reached. There were no coercive remarks. In fact, the court phrased its comments to the jury in the form of a request, saying, "I am going to *ask* you to deliberate further[,]" and "I'll *ask* you to go with the bailiff...."

(Emphasis added [in slip opinion].)  The record does not establish jury coercion.

(People v. Hinton, slip op. at 4-5.)[2]

A jury verdict requires unanimity.  Upon a signal from the jury that an impasse has been reached, a judge may properly charge the jury to resume deliberations.  Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).  The propriety of this supplemental charge must be judged "in its context and under all the circumstances."  Jenkins v. United States, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965).  These adjudicative norms are clearly established because the Supreme Court has "set forth a working constitutional standard by which to evaluate [the claim at issue.]"  Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001).  The result is a fact-intensive inquiry into the extent of any coercive statements made by the trial judge.  Packer v. Hill, 277 F.3d 1092, 1101 (9th Cir. 2002).  The facts in this case, cited by the Court of Appeal, show no basis for relief.

The jury received this case on Thursday, May 21, 1998, more than five weeks after jury selection began and following 12 days of testimony, argument, and instructions.  At 4 p.m. that day, the jury asked for four things; a list of exhibits, clarification of the meaning of the word "connect" as it is used in the accomplice instruction found at section 3.12 of the California Jury Instructions (CALJIC), a review of the stipulations made in the case, and a reading of the testimony of Officer Wanner.  (RT 1536-40.)  Following discussion with counsel and the jury, the judge explained on Friday, May 22, 1998, that he and his staff were preparing the requested materials and would provide them as soon as they were ready.  (RT 1540.)  The judge sent the
/////

---

[2] The Court of Appeal's failure to cite to the Supreme Court does not indicate that their opinion is contrary to or an unreasonable application of the Court's precedent. See Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002).  Rather, what is required from the state courts is concurrence with the reasoning and result of the Supreme Court's decisions.  Id. ("Avoiding these pitfalls does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") The California Court of Appeal decision meets that standard.

jury to deliberate while those preparations were made and dismissed them following the lunch recess.  (RT 1540, 1542.)

Due to a holiday on Monday, May 25, 1998, the jury resumed deliberations on Tuesday, May 26, 1998.  On that day, the foreperson of the jury sent a note to the judge indicating that the jurors were unable to come to a unanimous decision.  (RT 1544.)  According to the note, the jurors felt "that further deliberations would be futile."  Id.  In response, the judge questioned the foreperson of the jury, asking if further deliberations might resolve the impasse, ("no," RT 1545), how many votes had been taken ("three," id.), and if there was anything that might assist the jury in reaching a verdict ("no," id.).  In addition, the judge asked for the vote total in the last vote taken, ("nine-three," id.), specifically admonishing the foreperson not to reveal the direction of the vote.

The judge then polled the jury in an attempt to learn if "further deliberations could lead to a verdict in this case."  (RT 1546.)  In addition to the foreperson, seven other jurors said that further deliberation would not be helpful.  (RT 1546-47.)  However, juror number 9 answered that further deliberation would assist.  (RT 1547-48.)  As a result, the judge ordered the jury to continue deliberations.  (RT 1548.)

Defense counsel moved for a mistrial based upon the eight "no" responses.  (RT 1549.)  The judge ordered argument on the issue following the lunch recess; however, no argument appears in the record.  On the morning of Thursday, May 28, 1998, the jury found Petitioner guilty of murder in the second degree and guilty of having personally used a firearm within the meaning of Penal Code Section 12022.5(a).

When examined in the context of this trial, the Court of Appeal correctly found the trial judge's instruction not to be coercive and his denial of Petitioner's motion for a mistrial proper.  At the time of their declared impasse, jurors had deliberated for no more than three days, with a significant part of the time spent hearing 70 pages of Officer Wanner's testimony.  Given that this case had 26 prosecution witnesses and nine defense witnesses, dozens of admitted pieces

of evidence, and spanned 12 days over the course of five weeks, the judge's single instruction to continue the relatively short deliberation was not unreasonable. See Lowenfield v. Phelps, 484 U.S. 231, 238 (1988)(noting that one of the purposes of the Allen charge is to avoid the societal cost of retrial); but see Jimenez v. Myers, 40 F.3d 976, 980 (9th Cir. 1993). The fact that jurors considered this extensive evidence for the next two days indicates that reasoned deliberations led to the breakthrough as opposed to judicial coercion. See United States v. Lorenzo, 43 F.3d 1303, 1307 (9th Cir. 1995)(holding there was no coercion when the jury deliberated an additional five and a half hours following an Allen charge); see also United States v. Beattie, 613 F.2d 762, 766 (9th Cir. 1980)(holding that three hours of additional deliberation indicated that the Allen charge was not coercive).

Furthermore, the judge avoided acquiring any information about the direction of the vote, learning only that the last vote had been nine to three, but knowing nothing about the identities of those in the minority. See Lorenzo, 43 F.3d at 1307 (upholding Allen charge where the judge knew nothing about the identity of the hold-out or whether the majority sought to acquit or convict); but see United States v. Sae-Chua, 725 F.2d 530 (9th Cir. 1984)(finding that judge's polling of jury and awareness of the identity of hold-out was impermissible coercion). The Court has held that it is improper for the trial judge in a federal trial to inquire as to the numerical division of a deadlocked jury. Brasfield v. United States, 272 U.S. 448, 449-50, 47 S.Ct. 135, 71 L.Ed. 345 (1926). "If a trial judge inquires into the numerical division of a jury and then gives an Allen charge, the charge is per se coercive and requires reversal." United States v. Ajiboye, 961 F.2d 892, 893-94 (9th Cir. 1992). However, such a rule does not implicate any constitutional considerations relevant to a habeas petition because it is based upon the court's supervisory power over proceedings in the federal courts, rather than its constitutional power over both federal and state courts. Brewer v. Hall, 378 F.3d 952, 956 (9th Cir. 2004). As such, this prohibition cannot be considered "clearly established." See Early v. Packer, 537 U.S. 3, 10, 123 S.Ct. 362, 366, 154 L.Ed.2d 263 (2002)(holding that application of United States v. Gypsum

14

1 Co., 438 U.S. 422, 462, 98 S.Ct. 2864, 2884, 57 L.Ed.2d 854 (1978), in habeas petitions cannot
2 be considered "clearly established" as it did not interpret any provision of the Constitution, but
3 rather, relied upon the supervisory power of the court over federal prosecutions)).

4 It is true that the trial judge did not admonish jurors that they should not
5 "surrender conscientiously held beliefs simply to secure a verdict for either party." U.S. v.
6 Mason, 658 F.2d 1263, 1268 (9th Cir. 1981). However, there is no requirement under the
7 Court's jurisprudence for such a statement from the bench. As a result, it can hardly be
8 considered clearly established under § 2254(d). See Lowenfield, 484 U.S. at 241 (upholding
9 lower courts ruling that the combination of polling the jury and issuing a supplemental
10 instruction was not coercive). Given the circumstances in this case, the Court of Appeal's belief
11 that one juror with doubt was sufficient to warrant further deliberation was neither contrary to,
12 nor an unreasonable application of federal law. See Locks v. Sumner, 703 F.2d 403, 407 (9th
13 Cir. 1983)(refusing to apply Brasfield to habeas petition brought by state prisoner because,
14 among other factors, the jury polling was not coercive, did not inquire into how jurors were
15 voting, and did not implore the jury to reach any decision). The court finds that habeas relief is
16 not warranted because there is nothing to indicate that the California Court of Appeal's
17 determination was objectively unreasonable. 28 U.S.C. § 2254(d)(1); see Williams v. Taylor,
18 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

19 For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's
20 application for a writ of habeas corpus be denied.

21 These findings and recommendations are submitted to the United States District
22 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within ten days
23 after being served with these findings and recommendations, any party may file written
24 objections with the court and serve a copy on all parties. Such a document should be captioned
25 "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections
26 shall be served and filed within ten days after service of the objections. The parties are advised

1 | that failure to file objections within the specified time may waive the right to appeal the District
2 | Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
3 | DATED:  November 29, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

13/habeas
Hinton.1174.F&R.wpd